Estate of Lloyd R. Smith, Deceased; Agnes G. Smith, William C. Heath, and J. J. Stamm, Executors v. Commissioner.
Estate of Lloyd R. Smith v. Commissioner
Docket No. 20187.
United States Tax Court
1950 Tax Ct. Memo LEXIS 77; 9 T.C.M. (CCH) 907; T.C.M. (RIA) 50250; October 17, 1950
*77 John Leekley, Esq., 757 N. Broadway, Milwaukee 2, Wis., for the petitioners. Frank T. Donahoe, Esq., and Richard L. Greene, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency of $917,710.98 in the estate tax of the estate of Lloyd R. Smith, deceased. Issues presented by the pleadings are the correctness of the respondent's action (1) in determining that the value of 10 shares of stock in Badger Meter Manufacturing Company, owned by the decedent at the time of his death, was $25 per share on that date instead of $22.50 per share, (2) in determining that the value of 408 shares of stock in Smith Investment Company owned by the decedent at the time of his death was $7,318.25 on that date instead of $3,232.50 per share, (3) in disallowing as deductions in determining the net estate, miscellaneous administration expenses totaling $3,519.75, (4) in not allowing as a deduction in determining the net estate the amount of $14,981.36 representing debts paid during the administration of the estate, and (5) in not allowing as deductions in determining the net estate, additional attorneys' fees in the *78 amount of $50,000 and additional administration expenses in the amount of $5,000, incurred or to be incurred. At the hearing the petitioners conceded the correctness of the respondent's action in issue (1). The respondent conceded the deductibility of the amounts involved in issues (3) and (4) and with respect to issue (4) conceded the deductibility of a further amount of $271.39. The foregoing concessions leave for determination only issues (2) and (5). The petitioners claim an overpayment of $76,887.46. Findings of Fact A portion of the facts were stipulated and are found accordingly. Lloyd R. Smith died testate and a resident of Milwaukee, Wisconsin, on December 23, 1944. Agnes G. Smith, the widow of the decedent, William C. Heath, and J. J. Stamm are the executors of the decedent's will. The estate tax return for the decedent's estate was filed with the collector for the district of Wisconsin at Milwaukee, on December 3, 1945. At the time of his death, Lloyd R. Smith owned 408 shares of common stock in Smith Investment Company, sometimes referred to herein as Investment Company, or 21.94 per cent of the Company's total issued and outstanding stock of 1860 shares. Investment *79 Company, a Delaware corporation, was organized on August 28, 1923 with an authorized capital of 2000 shares of common stock of no par value, which was subsequently changed to a par value of $10 per share. No other stock was authorized or issued. The Company was organized and operated primarily for the purpose of holding the shares of stock owned prior to August 28, 1923 by decedent and his wife, Agnes G. Smith, in A. O. Smith Corporation, sometimes hereafter referred to as Smith Corporation. At that time the decedent alone owned a majority of the outstanding common stock of Smith Corporation. Although Investment Company's certificate of incorporation provided broad powers to engage in various types of business the Company never, from the time of its incorporation to December 23, 1944, engaged in any manufacturing or mercantile operations. Upon the formation of Investment Company decedent acquired 1925 shares of stock in it at $10 per share and Mrs. Smith acquired the remaining 75 shares at the same price per share. Investment Company thereupon, purchased from the decedent and Mrs. Smith their holdings of common and preferred stock in Smith Corporation and in other corporations as *80 follows for the amounts indicated: A. O. Smith Corporation (58,735
shares of common stock)
$ 807,940.71
A. O. Smith Corporation (preferred
stock)
204,360.28
Armstrong Rubber Company
150.00
E. L. Bruce Company
5,600.00
$1,018,050.99
At all times subsequent to August 28, 1923, Investment Company owned a majority of the common stock of Smith Corporation. During each of the years 1940 through 1944 not less than 99.75 per cent of its income consisted of dividends received on the common stock it owned in Smith Corporation. During the period from August 28, 1923 to December 23, 1944, the entire stock of Investment Company was owned by the decedent and members of his immediate family. During the years 1934 to 1940 decedent transferred by gift 1377 shares of stock in Investment Company to Mrs. Smith and to or for the benefit of their five children whose names, dates of birth, and ages on December 23, 1944 were as follows: Age on
Date of Birth
Dec. 23, 1944
June Ellyn Smith (Johns)
Apr. 7, 1919
25 years
Lloyd Bruce Smith
Oct. 13, 1920
24 years
Suzanne Smith
Oct. 17, 1922
22 years
Dana Lou Smith
May 10, 1928
16 years
Arthur O. Smith
Aug. 16, 1930
14 years
*81 On December 23, 1944 the stock in Investment Company was held as follows: No. of
shares
L. R. Smith (Decedent)
408
Agnes G. Smith
87
June Ellyn Smith (Johns)
11
Lloyd Bruce Smith
11
Suzanne Smith
11
Dana Lou Smith
2
Arthur O. Smith
2
Agnes G. Smith, Trustee for Dana Lou
Smith (Trust of 8/20/35)
8
Agnes G. Smith, Trustee for Arthur O.
Smith (Trust of 8/20/35)
8
Agnes G. Smith, Trustee for Dana Lou
Smith (Trust of 3/14/37)
1
Agnes G. Smith, Trustee for Arthur O.
Smith (Trust of 3/14/37)
1
L. R. Smith, Agnes G. Smith, and J. J.
Stamm, as Trustees for June Ellyn
Smith (Johns) U/A dated 8/26/37
262
L. R. Smith, Agnes G. Smith, and J. J.
Stamm, as Trustees for Lloyd Bruce
Smith U/A dated 8/26/37
262
L. R. Smith, Agnes G. Smith, and J. J.
Stamm, as Trustees for Suzanne Smith
U/A dated 8/26/37
262
L. R. Smith, Agnes G. Smith, and J. J.
Stamm, as Trustees for Dana Lou Smith
U/A dated 8/26/37
262
L. R. Smith, Agnes G. Smith, and J. J.
Stamm, as Trustees for Arthur O. Smith
U/A dated 8/26/37
262
Total
1,860
The principal of the trust created on August 20, 1935 and March 14, 1937 is distributable to the respective beneficiaries *82 upon their reaching 21 years of age. Onehalf of the principal of the trusts created under agreements dated August 26, 1937 is distributable to the respective beneficiaries upon their reaching age 30 and the remainder upon their reaching age 40. The agreements contained further provisions relating to the termination of the trusts and the distribution of principal in event the respective beneficiaries should die prior to reaching age 40. The trustee or trustees of all the foregoing trusts were given broad powers. Under the trusts created on August 20, 1935 and March 14, 1937 the trustee was expressly given the same power to deal with the trust fund as the donor would have if the gift in trust had not been made, and in addition was expressly authorized to dispose of the Investment Company stock, which formed the principal of the trust, and to participate in any reorganization or dissolution of that company. The trust agreements dated August 26, 1937 provided that the trustees "shall use and deal with any part and all of the Trust Fund as if they held such property in their own right and without any application to any court, or judge or justice thereof, for leave or confirmation, unless *83 the same shall be expressly required by law and shall be unwaivable even by this provision of the Trust Agreement." In addition, they were specifically authorized to unite with other owners of similar property in carrying out any plan for the reorganization or dissolution of any corporation or company whose securities at any time formed a portion of the trust fund. By the terms of the trust agreements dated August 26, 1937, William C. Heath, upon the death of the decedent, succeeded him as a trustee of the trusts created by those agreements. Upon the death of the decedent the 408 shares of stock in Investment Company owned by him on that date became part of his estate. Decedent made no specific bequest of the stock and it fell into the residuary portion of his estate. Said portion of the decedent's estate was, under the terms of his will, left in trust with the income therefrom to be paid to Mrs. Smith during her life. The trust is to terminate upon the death of Mrs. Smith, except in case of her death prior to January 1, 1956, then it is to terminate on January 1, 1956 provided the trustees should be of the opinion that termination would not prejudicially affect any business interests *84 that might be involved in the trust and the beneficiaries shall have shown sufficient character and ability to receive the principal of the trust fund to which they are entitled without detriment to their respective interests. Otherwise the trust is to continue until such time as the trustees shall determine that termination would not be prejudicial but not beyond January 1, 1966. Upon termination of the trust all the principal and the accumulated income is to be distributed to such of the decedent's lineal descendants, per stirpes, as are living on the day of termination of the trust. In his will decedent named Mrs. Smith, William C. Heath and J. J. Stamm as executors thereof and as trustees of the trust created therein. At all times referred to herein Stamm was secretary and treasurer of Smith Corporation and the secretary-treasurer of Investment Company. Heath has been president of Smith Corporation at least since 1937 and previously was a vice-president. With respect to Investment Company and Smith Corporation the decedent in his will, among other things, authorized his executors or trustees, in their discretion to act with other stockholders of the respective corporations *85 to continue the existence of such corporations, to liquidate them at any time or to transfer their assets to other corporations, and generally to exercise the same broad authority and powers which the decedent might exercise with reference thereto were he living. In addition, the executors and trustees were authorized to use and deal with any part of the estate or of the trust fund as if they held such property in their own right and without any application to any court, or judge or justice thereof, for leave or confirmation unless the same be expressly required by law and such authority was unwaivable. In all matters left to the discretion of the trustees under the trust agreements of August 26, 1937, and the executors of, and trustees under, the decedent's will they were directed to act as a body after having decided the matter by a majority vote. At all times mentioned herein Investment Company was a personal holding company as defined in the Internal Revenue Code. Accordingly, it was not subject to the excess profits tax, and by reason of its dividends paid credit resulting from the distribution of its income as dividends to its stockholders it did not pay or incur any personal *86 holding surtax at any time. The basis for Federal tax purposes of the Investment Company stock to the estate of the decedent or the executors thereof was the fair market value of the stock on December 23, 1944 and the basis of the stock in the hands of all other stockholders on that date was $10 per share. Between January 1, 1935 and the end of December, 1942, Investment Company made several distributions to its stockholders, either as dividends or as distributions in partial liquidation of common stock owned by it in Smith Corporation. The first of such distributions occurred on January 30, 1935 when Investment Company distributed 400 shares of Smith Corporation stock at the rate of two-tenths share of the latter for each share of the former. The market price of the Smith Corporation stock on that date was $40 per share. On February 1, 1935 the decedent was indebted to Mrs. Gertrude S. Slocum, his sister, in the amount of $360,887.04. On that date and in payment of such indebtedness he transferred to her 67 shares of stock owned by him in Investment Company. On June 5, 1935 he was indebted to Mrs. Alma S. Wright, another sister, in the amount of $287,329.98. In payment of such *87 indebtedness he transferred to her on said date 42 shares of stock owned by him in Investment Company. The stockholders of Investment Company at a meeting held on September 4, 1936 adopted a proposal contained in a resolution adopted by the board of directors of the company on August 25, 1936 allowing stockholders of the company to liquidate their stock in the company for a proportional part of the company's assets. The minutes of the stockholders' meeting, as well as those of the board of directors, provided in part as follows: "WHEREAS, the Smith Investment Company has no debts or obligations outstanding, and "WHEREAS, its assets consist of cash, advances to its president, and miscellaneous marketable securities totalling the equivalent of $53.51 per share of Smith Investment Company stock outstanding, and of A. O. Smith Corporation common stock amounting to 283,517 shares, or 141.7585 shares of A. O. Smith Corporation common stock per share of Smith Investment Company stock outstanding, and "WHEREAS, the stock of Smith Investment Company is unmarketable and unsaleable, and it is therefore deemed advisable to give the stockholders of Smith Investment Company the opportunity *88 at this time to liquidate such part or all, or none, of their respective holdings of stock in the Smith Investment Company, as each stockholder in his or her sole discretion shall determine, in exchange for the portion of assets of the Smith Investment Company as is represented by the number of shares of Smith Investment Company to be so liquidated, "BE IT RESOLVED: "(1) That the stockholders of this company may liquidate such part or all, or none, of their respective holdings of stock in this company, as each stockholder in his or her sole discretion shall determine, to receive in exchange therefor the portion of assets of the Smith Investment Company as is represented by such stock to be liquidated; "(2) That the stockholders shall each respectively indicate to the Company the number of shares if any of Smith Investment Company common stock he or she wishes to liquidate by mailing the stock certificate or certificates representing his or her holdings of stock in the Smith Investment Company to J. J. Stamm, Treasurer, Smith Investment Company, c/o Prentice-Hall, Inc., Room 663, 222 West Adams Street, Chicago, Illinois, within ten days from the date of this meeting, with a letter *89 signed in the same way and form in which the stock certificate is issued, indicating the number of shares he or she wishes to liquidate; "(3) That the Treasurer of the Company shall at end of such ten day period, or as promptly thereafter as is possible, issue to such stockholder $53.51 in cash and 141.7585 shares of A. O. Smith Corporation common stock for each share of Smith Investment Company to be liquidated; "(4) That such shares of stock as shall be so liquidated shall be forthwith retired by the Company and the stated capital of the Company shall be reduced to the extent of shares so retired: * * *" Mrs. Slocum and Mrs. Wright elected to surrender their entire holdings in Investment Company and the decedent elected to surrender 21 shares of his holdings. Accordingly, on September 14, 1936 the company distributed to Mrs. Slocum 9498 shares of common stock in Smith Corporation and $3,575.60 in cash in cancellation of her 67 shares in Investment Company. On the same day it distributed to Mrs. Wright 5954 shares of common stock in Smith Corporation and $2,239.84 in cash in cancellation of her 42 shares in Investment Company, and distributed to the decedent 2977 shares of common *90 stock in Smith Corporation and credited his account with the amount of $1,119.92 in cancellation of 21 of his shares in Investment Company. The market price of Smith Corporation common stock on the date of distribution was $53 per share and the aggregate market value of the total 18,429 shares distributed was $976,737. The total market price of the 141.7585 shares of Smith Corporation common stock distributed for each share of Investment Company stock cancelled was $7,513.20. The stock in Investment Company thus surrendered totaling 130 shares was retired in 1936, thereby reducing the outstanding shares from 2000 shares to 1870 and the stated capital of the company was reduced to the extent of the shares thus retired. The foregoing distribution was not pro rata and was not made to all the stockholders in Investment Company. The foregoing distribution of Smith Corporation stock to Mrs. Slocum, Mrs. Wright and the decedent was treated on the records of Investment Company as a distribution in partial liquidation. It was so regarded in the capital stock tax return filed by Investment Company for the year ending June 30, 1937. The distributions to Mrs. Slocum, Mrs. Wright and the *91 decedent were reported by them in their respective 1936 Federal income tax returns as distributions in partial liquidation. In a disposition of the income tax liabilities of Mrs. Slocum and Mrs. Wright for 1936 it was agreed that as to them the distributions were in partial liquidation as reported by them. The 21 shares of Investment Company stock surrendered by the decedent represented a part of his holding of 1767 shares. In a settlement of his 1936 income tax liability it was agreed that the distribution received by him in that year with respect to said 21 shares of stock represented a taxable dividend under section 115(g) of the Revenue Act of 1936. On December 28, 1942, Investment Company distributed to decedent 1415 shares of common stock in Smith Corporation in cancellation of 10 shares of stock in Investment Company, at a ratio of 141.54 shares of Smith Corporation stock for each share of Investment Company stock. The market price of Smith Corporation common stock on the date of distribution was $17.625 per share and the aggregate market price of the 1415 shares was $24,939.38. The shares of stock in Investment Company thus surrendered were retired in 1942 thereby reducing *92 the outstanding shares from 1870 to 1860 and the stated capital of the company was reduced to the extent of the shares of stock so retired. The foregoing distribution was not pro rata and was not made to other shareholders of Investment Company. In his 1942 Federal income tax return the decedent reported the receipt of the Smith Corporation stock in the amount of $24,939.38 as ordinary taxable dividend. Investment Company reflected the distribution on its books as a distribution in partial liquidation and not as a dividend. In addition to the foregoing distributions of Smith Corporation stock by Investment Company in 1935, 1936 and 1942 there were numerous other dispositions of it. In 1933 Investment Company transferred to William C. Heath as a "gift" 1000 shares of its stock in Smith Corporation. In 1934 it again made a transfer to him of 1000 shares. He was not an officer or an employee of Investment Company but in those years was a vice-president of Smith Corporation and was very close to the decedent. These transfers of stock were reflected in the 1933 and 1934 tax returns of the Investment Company as nondeductible donations. However, in decedent's 1933 gift tax return 96 1/4 per *93 cent of the 1933 transfer was reported as a gift by decedent to Heath. In 1937 Investment Company transferred 200 shares of its stock in Smith Corporation to John M. Floyd and in 1938 transferred to him 100 shares. Floyd is vice-president in charge of operations of Smith Corporation and has been a vice-president since 1937. He was not employed by, and was not an officer of Investment Company. The transfers of stock to Floyd were not referred to in the corporate reports or returns of Investment Company either as donations or expenses. Other donations or gifts of Smith Corporation stock owned by Investment Company were as follows: Name or description
No. of
Date
of recipient
shares
Dec. 16, 1924
Unknown (Christmas pres-
ents)
135
June 1, 1926
Mr. Andrene
100
Dec. 22, 1926
Nephew of decedent
1
July 9, 1929
K. Gibbons
1
Dec. 23, 1930
Ed Graham, Lester Slo-
cum, C. W. Wright, G.
W. Givan P.O. and
C.B.D. (Christmas pres-
ents)
12
Dec. 23, 1932
Agnes G. Smith
100
Lyda C. Nichols
10
Andrene was an engineer employed by Smith Corporation and had no relationship to Investment Company. Slocum, Wright and Givan were brothers-in-law *94 of the decedent; Lyda C. Nichols was his aunt; Agnes G. Smith was his wife; and Gibbons, Graham and others were his nephews and nieces. None of these recipients of stock were employees of Investment Company. Prior to December 31, 1934 the decedent had made withdrawals or obtained advances from Investment Company totaling $191,614.69, all of which amount was outstanding on that date. Of said amount $46,000 was advanced in 1932 and $50,000 in 1933. The Treasury Department determined that the $46,000 advanced in 1932 and the $50,000 in 1933 were dividends distributed to the decedent in the respective years and taxed him accordingly. In 1942 Investment Company cancelled and wrote off of its books as indebtedness owing to it by the decedent the $96,000 total of advances made in 1932 and 1933 and debited the amount to its earned surplus account. The balance of the advances was further reduced to $93,500 for which amount decedent executed his note to the corporation. By the end of 1943 the amount of the note had been reduced to $91,500. During 1944 and prior to the decedent's death the note, which bore interest at the rate of 2 per cent, was further reduced to $91,000. That amount plus *95 accrued interest of $1,801.53 was owing on the note at the time of the decedent's death. At all times the principal asset of Investment Company has been its holdings of Smith Corporation common stock, which, on December 23, 1944, amounted to 263,265 shares of 52.8 per cent of that corporation's total outstanding common stock of 498,800 shares. As of December 1, 1944, Mrs. Slocum and Mrs. Wright, sisters of the decedent, held 56,173 shares and 40,029 shares, respectively, of Smith Corporation stock. Carl O. Day, executor of the Estate of Martin J. Gillen, deceased, held 9900 shares and Hayden Stone & Company held 5660 shares. The remaining 123,773 outstanding shares were held in amounts ranging from one share to 5000 shares by 972 other stockholders. Smith Corporation is a New York corporation organized in 1916 and has its plant and principal office in Milwaukee. It was and is an industrial corporation engaged in the manufacture and sale of various industrial products. Prior to November 1, 1916 the business was operated by a predecessor corporation, the A. O. Smith Corporation of Wisconsin, incorporated in 1904, and originally founded as a general machine shop in 1874. The business *96 carried on prior to 1904 was the manufacture of bicycle parts. In 1902 it produced the first pressed steel automobile frame. Prior to World War II the principal products of Smith Corporation were (1) automobile frames, consisting of chassis frames for automobiles, trucks and trailers; (2) tubular products, consisting of large diameter electric welded oil and gas pipe lines, and electric welded oil well casings; (3) vessels, consisting of electric welded heavy-wall and multi-layer pressure vessels for the oil chemical, synthetic rubber, and process industries, heat exchangers, glass-lined tanks for the brewing industry, electric welded fabricated structures such as engine bases and machine parts; (4) water heaters, consisting of gas and electric glass-lined domestic storage water heaters; and (5) welding electrodes and welding equipment. It also manufactured railroad products, tools and miscellaneous items. During World War II, Smith Corporation continued to manufacture the abovementioned commercial products and in addition manufactured and sold various war products for the armed services, consisting primarily of (1) bomb bodies (bomb casings) of the larger sizes, (2) landing gears *97 for the larger bombers, (3) torpedo air flasks for aerial and naval torpedoes, (4) welded aircraft stamping, and (5) propellers (welded hollow steel propeller blades for airplanes). The wholly owned subsidiaries of Smith Corporation, namely, Sawyer Electrical Products, and Smith Meter Products, manufactured and sold centrifugal pumps, submersible pumps, electric motors, portable blowers, portable grinders, and meters for measuring petroleum and its products. The following table shows the sales of the various products of Smith Corporation and its wholly owned subsidiaries for the fiscal years ended July 31, 1940 through July 31, 1944: Year ending
Year ending
Year ending
Product
7/31/40
7/31/41
7/31/42
Commercial
Frames
$17,049,840.88
$23,514,398.68
$13,059,573.43
Tubular products
7,044,491.22
10,463,552.34
6,075,548.72
Vessels
3,171,438.15
4,231,642.64
6,243,980.95
Railroad products
350,436.83
614,075.58
898,939.24
Welding electrodes and
equipment
170,394.96
416,148.13
774,000.31
Water heaters
18,560.00
1,694,206.61
2,071,709.80
Tools
790,986.63
1,349,397.78
524,144.54
Scrap
939,045.34
1,455,590.84
912,863.29
Miscellaneous
2,250.72
War Production
Bomb bodies
1,660,104.93
16,095,512.30
Landing gears
5,581,026.48
Torpedo air flasks
562,024.21
Welded aircraft stamp-
ing
Propeller
Vessels
Weldrod
Miscellaneous
A. O. Smith Corpora-
tion
$29,535,194.01
$45,399,117.53
$52,801,573.99
Subsidiaries
Sawyer Electrical Prod-
ucts
304,513.55
953,768.55
Smith Meter Products
300,224.00
964,123.05
1,550,769.74
Total sales per reports
to stockholders
$29,835,418.01
$46,667,754.13
$55,306,112.28
Less: Sales adjust-
ment due to renego-
tiation of govern-
ment contracts
1,250,000.00
Total sales after re-
negotiation adjust-
ment
$29,835,418.01
$46,667,754.13
$54,056,112.28
*98 Year ending
Year ending
Product
7/31/43
7/31/44
Commercial
Frames
$ 7,095,908.48
$ 7,750,925.93
Tubular products
7,369,852.44
14,990,289.47
Vessels
12,647,726.15
9,166,784.80
Railroad products
66,040.99
159,641.01
Welding electrodes and
equipment
1,552,166.35
1,959,046.07
Water heaters
910,803.06
2,232,527.60
Tools
1,325,814.53
388,860.33
Scrap
1,291,454.90
Miscellaneous
35,696.99
42,398.93
War Production
Bomb bodiess
92,895,594.92
58,311,589.44
Landing gears
29,999,110.26
45,738,834.42
Torpedo air flasks
8,386,463.65
14,458,030.28
Welded aircraft stamp-
ing
1,006,662.13
8,057,380.03
Propeller
2,623,277.00
7,173,121.72
Vessels
758,884.92
1,516,752.31
Weldrod
413,670.97
1,558,155.33
Miscellaneous
49,823.78
A. O. Smith Corpora-
tion
$168,379,127.74
$173,554,161.45
Subsidiaries
Sawyer Electrical Prod-
ucts
2,089,837.00
2,435,655.43
Smith Meter Products
2,799,482.00
2,122,777.00
Total sales per reports
to stockholders
$173,268,446.74
$178,112,593,88
Less: Sales adjust-
ment due to renego-
tiation of govern-
ment contracts
44,059,357.00
18,223,903.00
Total sales after re-
negotiation adust-
ment
129,209,089.74
159,888.690.88
*99 During the period from the Spring of 1941 to August 14, 1945, Smith Corporation shipped the following number of units of various war products: No. of
Casings for:
Units
(a) Demolition bombs (500 to 2000
lb. sizes)
4,050,000
(b) Chemical and incendiary bombs
(500 to 2000 lb. sizes)
435,000
(c) Large bombs (4000 to 22,000 lb.
sizes)
34,500
Landing gears for B-17 and B-29
bombers
16,750
Propeller blades
46,700
Torpedo air flasks
23,000
During the fiscal year ended July 31, 1945 Smith Corporation reached the highest level of production and sales in its history to that time. Total sales for the year were $194,464,034, and after renegotiation adjustments were $181,662,635. Prior to World War II, Smith Corporation was established as the leading manufacturer of automobile frames. During the 10-year period 1928 to 1937 it manufactured annually from 38.4 per cent to 63.8 per cent of the total automobile frames produced each year in the United States and Canada and the ratio of its unit production of automobile frames to the entire automobile production for that period was approximately 43.9 per cent. Although its percentage of the total production of *100 frames had declined to below 50 per cent in 1940, it continued to produce more frames than any other manufacturer. Prior to the war the corporation was also a leading manufacturer of electric welded oil and gas pipe lines but during the 10 years immediately preceding the war it had supplied pipe for only one major transmission line. The corporation's process for producing large diameter heavy line pipe was unique in the industry, consisting of electric resistance or butt-welding. Neither automobile frames nor transmission line pipe was manufactured by Smith Corporation during the war except for the armed services. The corporation continued to produce for war purposes these and the other commercial products referred to above. During the war it greatly expanded its facilities and productive capacity, particularly the capacity of its welded pressure vessel division and its welding electrode division. The facilities of the latter two divisions were expanded to increase production by about 400 per cent. As a result of the discontinuance of the manufacture of automobile frames and pipe lines for civilian purposes during the war there was a pent-up demand for these products which could *101 reasonably have been foreseen in December, 1944. Throughout the oil refining areas of the world as well as in the United States there existed a great need for new and modern equipment brought about by the war and obsolescence. It was anticipated that the corporation's pressure vessel division would continue at a relatively high rate of production and that the corporation would obtain its fair share of the resultant business. Smith Corporation's books, records and accounts were kept on an accrual basis with its fiscal year ending on July 31. The corporation's annual report to the stockholders for the fiscal year ended July 31, 1944 contained the following statement of the views of the management of the corporation respecting such matters as post-war reconversion, plant rehabilitation, new products for the post-war period and post-war plant expansion: "The commercial products, to which reference has herein previously been made and which in pre-war years accounted for the major portion of your Company's business, can continue to be produced in the plants where they are now being manufactured and no material reconversion problems are anticipated. However, as foreseen a year ago, it *102 is evident that some plant rehabilitation will be necessary for which purpose a reserve was previously created which should, in the best judgment of your management, prove adequate. This should not be confused with needs as may arise for post-war plant expansion which, while anticipated, cannot at this writing be definitely evaluated because of factors not presently determinable. "Your Company's management naturally has given thought to the matter of new products for the post-war period. While it would be premature to make any definite statements concerning this subject at the present time, it can be said that the parent corporation and its subsidiaries are planning to add new products to their respective lines. Furthermore, it is our belief that basic principles of design and manufacture unique to your Company can be more broadly applied in the future to a wide variety of products and markets. In due time these potential opportunities will be carefully studied to the end that the greatest possible benefits to your Company may be realized." The amount of the reserve for post-war adjustments and rehabilitation which had been set up as being adequate in the judgment of the management *103 was $1,000,000. The renegotiation of war contracts of Smith Corporation for the year ended July 31, 1943 was finally determined subsequent to December 23, 1944 and was made available to the stockholders and the public on or about February 28, 1945. The renegotiation of war contracts of the corporation for the year ended July 31, 1944 was finally determined on or about July 3, 1945 and was made available to the stockholders and the public on or about September 6, 1945. As of October 26, 1944, the date of the annual report of Smith Corporation for the year ended July 31, 1944, renegotiation proceedings were in progress with respect to the year ended July 31, 1943 and the Government had not indicated the amount of the refund. However, a reserve of $4,000,000 (after deducting applicable income and excess profits taxes) was provided for this purpose. As of that date renegotiation proceedings had not been instituted for the year ended July 31, 1944, and as it was not possible to estimate what refund, if any, would be required, no provision was made therefor. However, by December 1944 renegotiation of war contracts for the years ended July 31, 1943 and July 31, 1944 had progressed to *104 the point that it was recognized that final net profits after renegotiation and taxes would be within the range of $4,000,000 to $5,000,000 for each of the years. The net profit or loss after taxes of Smith Corporation, earnings or loss per share of common stock for the years July 31, 1925 through July 31, 1941 and net profit after taxes, and earnings per share before renegotiation, and earnings per share of common stock after taxes and renegotiation for the years July 31, 1942 through July 31, 1945 were as follows: Earnings or
Net profit or
(loss) per share
Net profit
(loss) after taxes
after taxes
after
but before
but before
taxes and
Year ended July 31
renegotiation [1]
renegotiation [1]
renegotiation
1925
$1,152,014.06
$ 2.30
1926
1,727,298.62
3.45
1927
3,656,962.58
7.31
1928
2,833,700.78
5.67
1929
7,308,962.07
14.61
1930
5,425,649.37
10.85
1931
3,234,438.77
6.47
1932
(4,876,550.18)
(9.75)
1933
(1,931,389.82)
(3.86)
1934
( 250,251.67)
(0.50)
1935
( 621,305.29)
(1.24)
1936
862,658.61
1.73
1937
16,555.05
.03
1938
( 982,155.63)
(1.96)
1939
108,131.58
.22
1940
1,686,681.96
3.39
1941
2,734,657.23
5.50
1942
3,700,994.92
7.44
1943
[2] 7,483,723.00
15.00
[5] 4,680,598.00
1944
[3] 6,407,283.00
12.85
[6] 4,355,667.00
1945
[4] 5,135,867.00
10.30
[7] 4,133,467.00
*105 Net profit per
share after
taxes and
renegotation
1925
1926
1927
1928
1929
1930
1931
1932
1933
1934
1935
1936
1937
1938
1939
1940
1941
1942
$ 6.81
1943
9.38
1944
8.73
1945
8.29
*106 As shown by the statement of income and surplus contained in Smith Corporation's annual report to stockholders for the year ended July 31, 1944, a deduction of $704,267 was taken for interest expense in computing the corporation's net income of $6,407,283 shown therein for that year. The net profit of Smith Corporation for the quarter ended October 31, 1944 after provision for taxes but subject to renegotiation and year-end adjustments was $1,386,534. From the time of its incorporation in 1916 until August 31, 1935, Smith Corporation had outstanding 7 per cent preferred stock of which 30,000 shares were originally issued. Beginning in its fiscal year 1918 and continuing annually until August 31, 1935, with the exception of the years 1921 and 1922 and the years 1930 through 1932, the corporation retired a portion of this stock each year, the last of it, 5590 shares, being retired on August 31, 1935. During the time this stock was outstanding the corporation paid dividends totaling $2,386,300 thereon. It paid a total of $3,079,700.01 in retirement of the stock. On May 1, 1923 the corporation issued $4,725,000 of 10-year 6 1/2 per cent mortgage bonds. These bonds were retired in *107 full during the period ended July 31, 1934. After August 31, 1935 the corporation had no outstanding issue of bonds or preferred stock and its capital structure consisted solely of common stock. Payment of dividends on the common stock during the time the preferred stock and bonds, respectively, were outstanding was made only after the payment of interest on the bonds and after payment of dividends on the preferred stock and the application of a portion of corporate earnings to the retirement of the preferred stock. Dividends paid on the common stock per share during the calendar years 1916 through 1944 (adjusted to the number of shares of stock outstanding on December 23, 1944) were as follows: 1916
1917
1918
1919
1920
1921
1922
$ .05
1923
.20
1924
.20
1925
.30
1926
.50
1927
.90
1928
$1.20
1929
1.40
1930
2.00
1931
1.50
1932
1933
1934
1935
1936
1937
1938
1939
1940
$ .50
1941
.50
1942
1.00
1943
1.00
1944
1.00
The following is a comparative balance sheet of Smith Corporation at July 31, 1939, July 31, 1944 before renegotiation (for the years ended July 31, 1943 and July 31, 1944) and July 31, 1944 after renegotiation for years *108 ended July 31, 1944. ASSETS
July 31, 1939
Current Assets: Cash
$ 434,652.52
U.S. Treasury notes - Series
C
Accounts receivable (less
1,174,218.61
reserve)
Inventories
4,152,645.54
Amounts due from U.S.
Government (net)
Life insurance policies, cash
882,709.80
616.00
surrender value
Due from employees and
25,511.62
affiliated companies
Post-war refund of excess
profits tax
Total current assets
$ 6,669,738.09
Other assets
960,334.84
Fixed Assets: Property plant and equipment
9,132,351.36
(less reserve)
Patents (less reserve)
Unamortized expenditures
under war contracts
Deferred charges
578,841.35
Goodwill
1.00
Total assets
$17,341,266.64
Current Liabilities: Accounts payable
$ 583,114.01
Customers' deposits on
832.00
contracts
Current installments on
26,153.72
purchase obligations
Other current liabilities -
Payroll, capital stock,
personal property
tax, social security, etc.
655,482.96
Accrued state and federal
66,500.00
income taxes
Notes payable - Banks
400,000.00
Reserve for renegotiation of
war contracts 1943-44
Total current liabilities
$ 1,732,082.69
Other Liabilities: Real estate contracts and
76,946.15
accounts payable
Revolving V loan - Due
8/31/46
Reserves
325,725.05
Capital Stock and Surplus: Common stock issued 500,000
shares, $10 par value
per share
$ 5,000,000.00
$ 5,000,000.00
Earned surplus
10,265,632.86
27,823,357.00
$15,265,632.86
$32,823,357.00
Less: Reacquired stock at
59,120.11
15,168.00
cost - 1,200 shares
15,206,512.75
$17,341,266.64
*109 ASSETS
July 31, 1944
July 31, 1944
before
after
renegotiation
renegotiation
Current Assets: Cash
$ 12,784,109.00
$ 12,784,109.00
U.S. Treasury notes - Series
19,385,390.00
19,385,390.00
C
Accounts receivable
(less reserve)
14,762,432.00
14,762,432.00
Inventories
21,990,338.00
21,990,338.00
Amounts due from
U. S. Government (net)
1,312,252.00
1,312,252.00
Life insurance policies,
cash surrender value
1,215,616.00
1,215,616.00
Due from employees and
affiliated companies
Post-war refund of
excess profits tax
34,482.00
2,639,101.00
Total current assets
$ 71,484,619.00
$ 74,089,238.00
Other assets
283,805.00
283,805.00
Fixe Assets: Property plant and
equipment (less reserve
10,308,993.00
10,308,993.00
Patents (less reserve
37,564.00
37,564.00
Unamortized expenditures
under war contracts
288,776.00
288,776.00
Deferred charges
421,824.00
421,824.00
Goodwill
1.00
1.00
Total assets
$ 82,825,582.00
$ 85,430,201.00
Current Liabilities: Accounts payable
$ 4,887,177.00
$ 4,887,177.00
Customers' deposits on
contracts
188,964.00
188,964.00
Current installments on
purchase obligations
Other current liabilities
- Payroll, capital stock,
personal property
tax, social security, etc.
6,093,175.00
6,093,175.00
Accrued state and federal
2,381,864.00
2,381,864.00
income taxes
Notes payable - Banks
Reserve for renegotiation of war contracts 1943-44
4,000,000.00
11,459.360.00
Total current liabilities
17,551,180.00
$ 25,010,540.00
Other Liabilities: Real estate contracts and accounts payable
Revolving V loan
- Due 8/31/46
30,000,000.00
30,000,000.00
Reserves
2,466,213.000
2,466,213.00
Capital Stock and Surplus; Common stock issued 500,000
shares,
$10 par value
per share
$ 5,000,000.00
Earned surplus
22,968,616.00
$27,968,616.00
Less: Reacquired stock at
cost
- 1,200 shares
15,168.00
32,808,189.00
27,953,448.00
$ 82,825,582.00
85,430,201.00
*110 .
The liability item "Revolving V Loan Due August 31, 1946 $30,000,000.00" represented notes payable to banks which were issued under a revolving credit agreement guaranteed by the United States War Department and which were to be liquidated out of receipts from Government contracts and termination allowances or reimbursements. The loans were to provide working capital solely for the prosecution of war contracts. They were expected to be terminated at the end of the war and were not for longer term financing. On the basis of the foregoing balance sheet the book value per share of Smith Corporation stock was $30.48 on July 31, 1939, $65.77 on July 31, 1944 before renegotiation and $56.04 on that date after renegotiation. The life insurance policies shown on the balance sheets at July 31, 1944 at a cash surrender value of $1,215,616 represented life insurance policies owned by Smith Corporation on the life of decedent and others. Of said amount $884,711.95 represented the cash surrender value of policies on the life of the decedent. The face amount of such policies payable to the corporation on the death of the decedent was $2,145,000 or $1,260,288.05 in excess of such cash surrender *111 value. The proceeds of such policies were added to the earned surplus of the corporation for the fiscal year ended July 31, 1945, the year of the decedent's death. The excess of such proceeds over cash surrender value amounted to $2.53 per share of Smith Corporation stock. The common stock of Smith Corporation was listed and regularly traded in on the New York Stock Exchange. The following is a statement of the number of shares of the corporation's stock sold and the range of the market price of the stock on such exchange for the calendar years 1935 through 1945: No. of
Year
High
Low
shares sold
1935
72
29
184,216
1936
72
40 1/4
159,800
1937
54 1/2
13
107,300
1938
24
13
65,700
1939
21
11 3/8
42,600
1940
22
10 1/2
39,300
1941
25 5/8
14 1/2
58,000
1942
20 3/4
15 1/4
23,000
1943
39 1/2
19
115,400
1944
54 1/4
29 1/2
91,400
1945
96
48 1/2
176,500
The monthly sales of Smith Corporation common stock and the range of the market price of the stock on the New York Stock Exchange for the period July 1, 1944 through June 30, 1945 were as follows: No. of
Month
High
Low
shares sold
July, 1944
41 1/4
36
7,200
August
38
36
2,700
September
40 1/2
35 1/2
3,500
October
44 1/4
39 3/4
10,400
November
46 3/8
41 1/2
13,800
December
54 1/4
45 1/4
15,000
January, 1945
54
48 1/2
7,100
February
77
48 1/2
20,800
March
76
59 1/2
19,500
April
74 3/4
63
1,670
May
71
64 1/2
12,400
June
74 1/2
66 1/2
23,400
*112 During the month of November 1944 the market price of Smith Corporation common stock was upward, the low of 41 1/2 for the month having occurred on November 6 and the high of 46 3/8 having occurred on the last day of the month. During the first half of December the market price continued upward reaching the high of 54 1/4 on December 15. Thereafter, during the month the price declined reaching a low of 49 1/2 on December 27 but rose to 53 1/2 at which the market closed on December 31. On December 23, 1944, the date of the decedent's death, there were 400 shares of Smith Corporation common stock sold on the New York Stock Exchange at a high of $51 1/2, low of $51 1/4, mean of $51 3/8 and close of $51 1/4. During the period from 1923 through 1944 the stock of Investment Company was not listed on any exchange. During that period there were no sales (except the decedent's transactions in the stock with Mrs. Slocum and Mrs. Wright in 1935), no published quotations, nor any offers by brokers, of the stock. At the time of the decedent's death and continuing at least until September 10, 1945 there was no market for the stock. Although the cost to Investment Company of its 263,265 shares *113 of stock in Smith Corporation was $2.75 per share the company carried the stock on its books at a value of $5.91 per share or at a total amount of $1,555,900.81. On the basis of such value for the Smith Corporation stock the book value of Investment Company stock on December 23, 1944 was $881.66 per share. On the basis of a selling price of $51 3/8 per share for Smith Corporation stock and the market value of other stocks owned by Investment Company the asset value per share of Investment Company stock on December 23, 1944 was $7,317.28 as reflected by the following adjusted balance sheet of Investment Company as of that date: ASSETS
Cash on Hand and in Bank
$ 2,772.26
Dividend Receivable
6.00
A. O. Smith Corporation Stock
(263,265 shares at $51,375)
13,525,239.38
E. L. Bruce Co. (100 shares at $35)
3,500.00
Miss. & Skuna Valley R. R.
(5 shares at $40)
200.00
L. R. Smith - Note Receivable
(bearing interest at the rate of
2 per cent per annum)
91,000.00
Accrued Interest on Note
1,801.53
$13,624,519.17
LIABILITIES, CAPITAL STOCK
AND SURPLUS
Wisconsin Privilege Dividend Tax
$ 360.80
Provision for Federal and State
Income Taxes
14,017.74
Capital Stock (1860 shares, $10 par
value)
18,600.00
Capital Surplus
801,169.25
Earned Surplus
820,127.43
Surplus Due to Appreciation of
A. O. Smith Corporation Stock
11,970,243.95
$13,624,519.17
*114 On the basis of a value of $65.77 for Smith Corporation stock, its book value on July 31, 1944 before renegotiations, and market values for the other stocks of Investment Company, the book value of its stock on December 23, 1944 was $9,354.27 per share. On the basis of a value of $56.04 for Smith Corporation stock, its book value on July 31, 1944 after renegotiations, and market values for the other stocks of Investment Company, the book value of its stock on December 23, 1944 was $7,977.51 a share. The following is a statement of the dividends (cash) received by Investment Company from Smith Corporation, additional income of Investment Company consisting of dividends (other than on Smith Corporation stock), interest and gains on the sale of securities, net earnings after taxes or loss of Investment Company, the dividends distributed by that company (excluding distributions of Smith Corporation stock referred to above), the earnings or loss per share of Investment Company stock and the dividends paid per share for the period August 28, 1923 through December 31, 1944 (by calendar years) and the dividends paid per share less Wisconsin dividend privilege taxes for the years 1940 through *115 1944: Net
Dividends
Additional
earnings
Dividends
Received
Income
or (loss)
distributed
Earnings
from
of Invest-
of Invest-
by Invest-
or (loss)
Year
Smith Corp. *
ment Co.
ment Co.
ment Co.
per share
1923
$ 19,991.75
$ 3,622.56
$ 23,470.81
$ 11.74
1924
74,552.00
938.84
73,803.54
36.90
1925
94,150.00
556.35
94,605.54
47.30
1926
150,770.00
24,464.37
151,788.28
$100,000.00
75.89
1927
265,439.00
313,458.06
564,334.96
600,000.00
282.17
1928
348,943.00
107,114.13
420,420.24
425,000.00
210.21
1929
406,370.20
708,860.04
1,106,401.26
400,000.00
553.20
1930
578,653.00
4,333.09
506,640.75
900,000.00
253.32
1931
435,065.50
3,577.92
438,021.42
219.01
1932
3,981.25
4,622.73
7,773.36
**
3.869
1933
895.42
9,417.85
3,183.79
**
1.59
1934
189.00
(11,420.92)
(5.71)
1935
92.25
(12,305.39)
(6.15)
1936
1,801.76
(183.62)
(0.10)
1937
1,539.85
(20.54)
(0.01)
1938
116.00
(1,330.04)
(0.71)
1939
91.00
(694.07)
(0.37)
1940
132,340.00
153.00
128,795.14
124,168.00
68.87
1941
132,340.00
328.50
125,730.38
128,469.00
67.24
1942
263,265.00
275.25
261,774.62
263,127.70
140.74
1943
263,265.00
645.84
245,991.89
251,100.00
132.25
1944
263,265.00
1,925.53
242,314.32
242,376.60
130.28
*116 Dividends
Divi-
paid per
dends
share less
paid
Wisconsin
per
privilege
Year
share
tax
1923
1924
1925
1926
$ 50.00
1927
300.00
1928
212.50
1929
200.00
1930
450.00
1931
1932
1933
1934
1935
1936
1937
1938
1939
1940
66.40
$ 66.40
1941
68.70
68.70
1942
140.71
136.51
1943
135.00
132.82
1944
130.31
130.06
During the years 1923 through 1926 Investment Company applied all or a substantial part of its net earnings in payment of a promissory note executed to the decedent in connection with the original acquisition by the company of decedent's stock in Smith Corporation. The expenses, exclusive of taxes, of Investment Company for the years 1940 through 1944 were as follows: 1940
$107,68
1941
99.90
1942
267.64
1943
136.10
1944
59.60 During said years the company paid no salaries to officers, no director's fees and no management fees. The proportionate share or equity of Investment *117 Company in the net profits (after taxes) of Smith Corporation for the fiscal years ended July 31, 1940 through July 31, 1945, before and after renegotiation for the fiscal years ended July 31, 1943 through July 31, 1945, and the amount thereof per share of Investment Company stock were as follows: Year Ended
Before Renegotiation
After Renegotiation
July 31
Total
Per Share
Total
Per Share
1940
$ 892,254.76
$ 477.14
$ 892,254.76
$ 477.14
1941
1,454,837.65
777.99
1,454,837.65
777.99
1942
1,958,691.60
1,053.06
1,793,196.18
964.08
1943
3,951,405.74
2,124.41
2,471,355.74
1,328.69
1944
3,383,045.42
1,818.84
2,299,792.18
1,236.45
1945
2,711,737.78
1,457.92
2,182,470.58
1,173.37
The portion of the net profits of Smith Corporation for each of the years ended July 31, 1940 through July 31, 1945 which was no distributed as dividends, the amount thereof per share of Smith Corporation stock and the proportionate amount or equity therein per share of Investment Company stock before renegotiation and after renegotiation were as follows: Before Renegotiation
After Renegotiation
Amount
Amount
Amount
Year
Undis-
per share
per share
Undis-
per share
Ended
tributed
Smith Corp.
Investment
tributed
Smith Corp.
July 31
Net Profits
Stock
Co. Stock
Net Profits
Stock
1940
$1,686,681.96
$ 3.39
$ 477.14
$1,686,681.96
$ 3.39
1941
2,485,857.23
5.00
707.21
2,485,857.23
5.00
1942
3,203,394.92
6.44
906.65
2,898,604.88
5.81
1943
6,984,923.00
14.00
1,982.82
4,181,798.00
8.38
1944
5,908,483.00
11.85
1,677.25
3,856,867.00
7.73
1945
4,637,067.00
9.30
1,316.33
3,634,667.00
7.28
$49.98
$7,067.40
$37.59
*118 Amount
per share
Ended
Investment
July
31
Co.
stock
1940
$ 477.14
1941
707.21
1942
818.15
1943
1,187.15
1944
1,094.90
1945
1,031.83
$ 5,316.38
Under the terms of the decedent's will certain charitable bequests made by him were payable only at such time as the executors should deem prudent and for the best interests of his estate and might be paid at any time in full or in installments. In the sole discretion of the executors such bequests could be paid in securities (including stock in Investment Company or Smith Corporation), or in cash, or part in securities and part in cash, with securities to be calculated at the appraised values thereof as set forth in the appraisal in the matter of decedent's estate. By his will the decedent gave the executors thereof and the trustees of the trust fund created therein broad powers with reference to the management, investment, and disposition of his estate, in which was included the power to borrow such sums of money as they deemed necessary or advisable for the protection of the estate or trust fund and to pledge the assets of the estate or trust fund as collateral for the payment of such sums. The *119 executors or trustees could provide that such loans could constitute a lien upon the estate or trust fund prior to the claim of any beneficiary or distributee. In making payments of legacies the executors elected to make payments in 1945 and 1946 in cash instead of in securities. They also elected to make current payments of Wisconsin inheritance taxes at a discount instead of deferring payment and subjecting the estate to the payment of interest thereon. In 1945 and prior to and during September of that year John Leekley, as attorney for the estate of the decedent consulted with J. J. Stamm as to the desirability of making sales of some of the stock in Investment Company which the estate owned. Leekley had been an attorney for the decedent from 1935 to the time of the decedent's death, and was an attorney for Mrs. Smith after decedent's death. He had been a director of Investment Company from about 1935 or 1936 and an officer of that corporation since 1940, being vice-president in 1945. He was also a director of Smith Corporation from 1937 to 1946 or 1947. Since about 1929 he had been an investment counsellor or advisor. In the course of his law practice Leekley had handled generally *120 cases involving federal estate and income tax matters and a few cases involving tax problems of personal holding companies. Pursuant to Leekley's advice to Stamm steps were taken by the estate in the latter part of August and the early part of September 1945 toward selling some of its stock in Investment Company. About August 28, 1945 Gardner F. Dalton, senior partner in the firm of Gardner F. Dalton & Company, of Milwaukee, a small organization, engaged principally in the business of buying, selling and underwriting of stocks and bonds, had a discussion with a representative of decedent's estate relative to his firm undertaking to dispose of some of the Investment Company stock owned by the estate. Dalton & Company took an option to act as agent of the estate on a non-committment basis to take from the estate what stock the estate desired to sell and which Dalton & Company could sell and to receive a commission for its services. Since June 8, 1945 Dalton had been making a study of Investment Company stock for the purpose of forming an opinion as to its fair market value on December 23, 1944, the date of the decedent's death. Another partner in Dalton & Company was Charles W. Givan, *121 a brother-in-law of decedent, an acquaintance of Stamm for 20 years and of Leekley for about 9 years and the recipient of a gift, as a Christmas present from decedent of some Smith Corporation stock owned by Investment Company. Under date of August 31, 1945 Stamm, on behalf of the decedent's estate, and pursuant to Regulation A of the General Rules and Regulations under the Securities Act of 1933 advised the Securities and Exchange Commission of the offering by the estate of 20 shares of its stock in Investment Company at a price of $5,000 a share to the public with underwriting discounts and commissions of $250 per share. In such notice it was stated that Dalton & Company was the principal underwriter of the sale of the stock and that "the net proceeds from the sale thereof (of the stock) are to be used by the Estate of Lloyd R. Smith, Deceased, for the cash requirements generally of the Estate." It was also stated that "It is proposed to sell the security only within the jurisdiction of the State of Wisconsin." Thereafter beginning on September 11, 1945 and continuing through September 13, 1945 Dalton & Company purchased from the decedent's estate in one and two share lots a total *122 of 20 shares at $4850 per share, less $242.50, which it sold during that period to 13 different purchasers in one and two share lots at $4850 per share. During the period September 19 through September 24, 1945 Dalton & Company made five purchases of the stock from the estate, three of which were of five shares each, one of four shares and one of one share at a price of $4750 per share, except one of the five share lots was at $4800 per share. Nineteen of said shares were sold to two dealers in stocks and one share was sold to an individual. All these shares were sold at a price which was $100 in excess of what Dalton & Company paid the estate for them. From October 1 through October 19, 1945 Dalton & Company made nine purchases from the estate in lots of one, two and three shares totaling 18 shares, paying $4750 per share for the first 13 shares purchased and $5250 per share for the remaining five shares. It sold these shares in one, two and three share lots at prices which were $100 per share in excess of what it paid the estate for them. On October 17, 1945 Dalton & Company purchased from one Robert C. Beck for $5200 one share of the stock which it had sold him on September 11, 1945 at *123 $4850. On January 21, 1946 Dalton & Company purchased from the estate 10 shares of the stock at $6200 per share which it sold to another dealer for $6300 per share. On May 13, 1946 Dalton & Company paid one Joseph F. Heil $6000 for one share of stock which he had purchased from Dalton & Company on September 12, 1945 for $4850. Between February 11 and February 25, 1947 Dalton and Company made four purchases from the estate of stock totaling 10 shares in lots of 2 and 3 shares. Two of the shares were purchased at $4000 each, three at $3900 each and the remaining five shares at $3800 each. These shares were sold by Dalton & Company at prices of $100 in excess of what it had paid for them. On January 28, 1949 Dalton & Company purchased 5 shares of the stock from the estate at $3200 per share which it in turn sold for $3300 per share to three different purchasers. Between September 1, 1949 and September 6, 1949 Dalton & Company made 7 purchases, totaling 10 shares, of the stock from the estate paying therefor $3650 per share which it in turn sold to 8 different purchasers for $3750 per share. On October 17, 1949 one Leon C. Mudd sold to Dalton & Company one share of the stock for $4350 *124 which he had purchased on September 2, 1949 for $3750 and which Dalton & Company in turn sold to another dealer for $4450. At the time Dalton & Company began offering Investment Company stock for sale Leekley, attorney for the estate, informed a local newspaper, which carried a news item about the stock, its sales and selling price per share, that the purpose of the estate in offering the stock was to create a market for it and to realize cash for estate purposes. So far as disclosed, the estate never attempted to sell any of its Investment Company stock except to Dalton & Company. During the period of approximately four years beginning September 11, 1945 and ending October 17, 1949 Dalton & Company bought and sold 122 shares of Investment Company stock. Of that number 93 shares were purchased from the estate and 21 shares from June Smith Johns, a daughter of decedent. Based on the asset value per share of Investment Company stock in which that company's stockholdings in Smith Corporation were included at current market values, the selling price of the sellers of Investment Company stock, including the estate, ranged from 47.1 per cent to 53.6 per cent of the asset value per share *125 of Investment Company stock and the selling price to the purchasers (customers of Dalton & Company) ranged from 48.5 per cent to 54.7 per cent of the asset value per share. The net sales and net profits, after taxes, of Smith Corporation for the fiscal years ended July 31, 1946 through July 31, 1948, as reflected in the annual reports of that corporation to its stockholders were as follows: Year ended
July 31
Net Sales
Net Profits
1946
$ 82,482,946
$ 550,939
1947
91,703,451
2,502,211
1948
139,477,780
6,891,882
Net profits per share and the dividends paid per share of Smith Corporation for the foregoing years were as follows: Dividends
Year Ended
Earnings
paid
July 31
per share
per share
1946
$ 1.10
$1.25
1947
5.00
1.00
1948
13.71
* 1.50
*126 As shown by the annual reports to its stockholders for the calendar years 1945 through 1949 Investment Company's net income, net income per share, dividends paid, dividends paid per share and dividends paid per share after deducting Wisconsin dividend privilege tax were as follows: Dividends paid
per share after
Dividends
deducting Wis-
Net
Net Income
Dividends
paid
consin dividend
Year
Income
per share
paid
per share
privilege tax
1945
$243,894.52
$131.13
$244,515.60
$131.46
$131.18
1946
242,275.99
130.26
242,302.20
130.27
129.82
1947
243,032.59
130.66
244,990.00
131.50
130.58
1948
437,501.55
235.22
437,527.80
235.23
232.86
On December 31, 1944 United States Foil Company, a Delaware corporation, sometimes hereafter referred to as Foil, had outstanding 6771 shares of 7 per cent cumulative preferred stock of a par value of $100 each entitled on liquidation to $100 per share plus accrued dividends and callable at $110 per share plus accrued dividends. Its outstanding common stock consisted of 60,000 shares of Class A voting stock of a par value of $1.00 each and 598,092 shares of Class *127 B non-voting stock of a par value of $1.00 each. Foil's principal asset was 547,584 shares, or 53.49 per cent of the common stock of Reynolds Metals Company, a Delaware corporation. During 1944 Foil's income from investments amounted to $564,809.67, of which $547,584 was received as dividends on its stock in Reynolds Metals. In 1944 Foil resumed manufacturing operations, engaging in a new undertaking, which it was contemplated would be continued and expanded after the war. In 1944 it realized net income of more than $71,000 from a government contract involving such operations. Foil's net profit for 1944 after taxes was $536,297.02, or 74 cents per share for its Class A and Class B stocks. In addition to payment of a dividend of $7 per share on its preferred stock, Foil, in 1944, paid a dividend of 55 cents a share on its Class A and Class B common stocks. Foil's Class B common stock was listed, and traded in on an exchange. The common stock of Reynolds Metals Company was also listed, and traded in on an exchange. Based on the market price on December 23, 1944 of most of the stocks owned by Foil, including its stock in Reynolds Metals which had a price of $15 1/4 per share, or $8,350,656, *128 and on book values at December 31, 1944 for other assets, all assets totaling $11,477,646.44, and on liabilities at December 31, 1944 of $1,393,963.85, the value of Foil's Class B stock was $14.29 per share. The selling price per share of the stock on December 23, 1944 was high $8 7/8, low $7 3/4 and average $8.31, with such average being approximately 58 per cent of the foregoing value of $14.29 per share. For some time prior to 1944 Reynolds Metals Company had been a producer of foil and for several years prior to 1944 had been engaged in the production of aluminum as well as aluminum powder and paste for paint. In 1944 almost its entire output of aluminum was used in the production of war material. At the end of 1944 officials of the company anticipated a greater and more extensive use of its products after the war than theretofore, and, accordingly, had made plans for a greatly increased business. On December 31, 1944 Reynolds Metals had outstanding 50,000 shares of 5 1/2 per cent cumulative convertible preferred stock of a par and involuntary liquidation value of $100 each plus accrued dividends. On voluntary liquidation or redemption the stock was entitled to $107.50 a share *129 plus accrued dividends. Also, there were outstanding 1,023,662 1/6 shares of common stock without par value. As disclosed by the balance sheet at December 31, 1944, contained in the annual report to stockholders for 1944, total assets amounted to $89,228,211.11 of which $48,121,941.11 represented current assets. Of the current assets cash amounted to $12,610.611.17. Current liabilities amounted to $26,687.236.63. Funded debt of $34,698.599.61 consisted of $29,250,000 of four per cent serial first mortgage bonds, a note payable to Reconstruction Finance Corporation for $4,282,224.50 bearing interest at four per cent, $947,950 of fifteen-year 3 1/2 per cent debenture bonds due in 1951, and $218,425 of purchase money mortgage notes due in 1946 through 1952. As shown in the profit and loss and surplus statement contained in the annual report interest expense was deducted in the amount of $1,688,269.73 in arriving at net income of $3,045,817.71 for the year. Dividends on the preferred stock for the year amounted to $275,000. The payment of dividends by Reynolds Metals Company was restricted under various loan agreements so that at December 31, 1944 no more than $1,303,855.63 could be *130 used to pay dividends on the common stock. The following is a statement of sales, net profit and earnings per share of common stock of Reynolds Metals Company for the years 1940 through 1944 as shown in the annual report for 1944. Earnings
per share of
Year
Sales
Net profit
common stock
1940
$ 29,157,971
$2,428,277
$2.10
1941
48,602,557
2,867,674
2,53
1942
86,068,181
1,373,592
1.07
1943
138,055,349
3,658,950
3.30
1944
165,215,210
3,045,818
2.71
On the basis of the balance sheet of Reynolds Metals Company at December 31, 1944 the book value of its common stock on that date was approximately $21.34 a share. In the estate tax return for the decedent's estate the 408 shares of stock in Investment Company owned by him were included in the gross estate at the value, as of the date of his death, December 23, 1944, of $3,500 per share or in the total amount of $1,428,000. In determining the deficiency involved herein the respondent determined that the value of the stock on said date was $7,318.25 per share, or an aggregate amount of $2,985,846. The value at the time of the decedent's death of the 408 shares of stock in Investment *131 Company owned by him was $5,700 per share or a total value of $2,325,600. Opinion In the estate tax return for the decedent's estate the petitioners reported the 408 shares of stock in Investment Company owned by the decedent as having a value of $3,500 per share at the time of his death, December 23, 1944, and included the stock in the gross estate at that value. In their petition they request that the value be determined at $3,232.50. At the hearing they contended that the value was from $3,200 to $3,300 a share, while on brief they take the position that it was $3,350 a share. The respondent determined that the value was $7,318.25 per share. However, at the hearing and on brief he contends that the value was $7,317.28 a share. The latter amount coincides exactly with the asset value per share of the stock computed by including in Investment Company's assets that company's 263,265 shares of stock in Smith Corporation at $51 3/8 per share, the mean selling price of Smith Corporation stock on the New York Stock Exchange on December 23, 1944. Relying on various aspects of the evidence the parties have made a number of arguments, all of which revolve around the ultimate question, *132 namely, the value of the 408 shares of stock in Investment Company on the critical date. Summarized the petitioners' arguments are (1) that the value of the shares is not to be determined on the theory that they could have been exchanged or liquidated for a proportional part of the assets of Investment Company but upon the basis of book value, earnings, dividend paying possibilities, opinion testimony and other relevant factors - all of which it is claimed indicate a value of $3,350 per share, (2) that a consideration of the market value on December 23, 1944 of the Class B common stock of United States Foil Company leads to the conclusion that the value of Investment Company stock on that date was not in excess of $3,350 per share, and (3) that the sales of Investment Company stock during the period September 11, 1945 through October 17, 1949 warrant a like conclusion. The respondent points out that Investment Company was organized and existed for the purpose of holding a controlling stock interest in Smith Corporation for the convenience and benefit of the Smith family who, either directly or by way of trusts, owned all the stock in Investment Company; that on various occasions *133 to the end of 1942 the decedent and other stockholders in Investment Company had exchanged or liquidated all or a portion of their shares in it for a proportional part of its holdings in Smith Corporation stock; and that by the powers decedent had conferred on the petitioners liquidated the estate's 408 shares of stock in Investment Company either by trust instruments or by will they could have for a proportional part of Smith Corporation stock (141.54 shares of Smith Corporation stock for each share of Investment Company stock) which concededly had a market price of $51 3/8 a share on December 23, 1944. From that he urges that the basic and proper criterion for the valuation of Investment Company stock is the net asset value of Investment Company stock predicated on the market value of Smith Corporation stock. Although as the petitioners contend, the estate's 408 shares of Investment Company stock represented a minority interest of only 21.94 per cent thereof and alone could not compel such a liquidation, we think it significant that the decedent had not only made petitioners executors of his will and trustees of the trust created therein, but also trustees of the trusts for his children *134 involving 1310 shares of Investment Company's 1860 outstanding shares. Under all these instruments the petitioners were given broad powers of action. While such a liquidation would have resulted in Investment Company losing control of Smith Corporation the control of the shares received in such liquidation as well as the control of Investment Company and the shares it continued to hold in Smith Corporation would have remained, as before, in the same three persons, the petitioners. While the petitioners in their dual capacities as trustees and executors could have effected a liquidation of the estate's Investment Company shares for Smith Corporation stock, any such liquidation for the purpose of disposing of the Smith Corporation stock to outsiders would have required them to consider matters unrelated to the estate including the effect of such action on the trusts of which they were trustees. A purchaser of the stock would be without assurance that he could liquidate it for a proportional part of Investment Company's assets. In this situation we are unable to conclude that the sole criterion of the value of the Investment Company stock is the value arrived at by the method proposed *135 by the respondent. The petitioners point to section 811 (k) of the Internal Revenue Code which provides that where the value of unlisted corporate stock and securities cannot be determined with reference to bid and asked prices or with reference to sales prices because of the absence of sales, the value shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. They contend that when, pursuant to the provisions of section 811 (k), consideration is given to the selling price on December 23, 1944 of Class B stock in United States Foil Company which was listed on the New York Curb Exchange we should conclude that the value of stock in Investment Company on that date was not in excess of $3,350 a share. The difficulty with the contention is that Foil and Investment Company were not engaged in the same or a similar line of business. Investment Company was purely a family holding corporation and never engaged in any *136 operations itself, either as a manufacturing or mercantile enterprise. Whatever may have been Foil's activities prior to 1944 in that year, in addition to holding 53.49 per cent of the outstanding common stock of Reynolds Metals Company, it resumed manufacturing operations which, it was contemplated, would be continued and expanded after the war and from which it received a substantial amount of income in 1944. Aside from other dissimilarities existing in the situations of the two companies, Foil's Class B stock, whose selling price the petitioners are urging us to consider, was a non-voting stock and was also subordinate both as to dividends and on liquidation to Foil's outstanding preferred stock. The Investment Company stock under consideration was a voting stock and the only class of stock the company had, or ever had, outstanding. In view of the foregoing, we do not think that the selling price of the Class B stock on the critical date is of controlling significance. Relying on the sales of Investment Company stock over the period from September 11, 1945 through October 17, 1949 which, at the prices received by the sellers, took place in a range of from 47.1 to 53.6 of the asset *137 values per share at the time the sales occurred, the petitioners urge that the value of Investment Company stock on December 23, 1944 was not in excess of $3,350 per share. The respondent contends that these sales which began approximately nine months after the critical date and extended to almost five years after such date are of no assistance in resolving value on the critical date. According to the information submitted by the estate to the Securities and Exchange Commission, sales of the Investment Company stock to be made by the estate were to be limited to sales within the jurisdiction of Wisconsin. So far as disclosed, the estate never attempted to sell any of the stock in any jurisdiction other than Wisconsin. According to other evidence, an underlying reason at least for the early sales was to create a market for the stock. So far as shown, the estate made no attempt to sell any stock except to or through Dalton & Company, a small local organization in which the decedent's brother-in-law was a partner. Nor is it disclosed whether any offering was made by the estate of the full 408 shares, or any effort made to sell the entire block either as a unit or in substantial quantities. *138 Of the sales made the greater portion by far were in lots of one and two shares. The evidence bearing on the point indicates that initially at least the efforts of Dalton & Company to sell the shares offered them were in the nature of peddling transactions. Under the circumstances, we fail to see how these sales could be given determinative effect here. Except for a few other assets of a comparatively small total value the assets of Investment Company consisted of its stockholdings in Smith Corporation. By means of such holdings the Smith family, through Investment Company, had been in control of Smith Corporation at least since 1923. By reason of such control they could determine the amount of dividends paid by Smith Corporation and, consequently, the earnings of Investment Company. The effect of such control is indicated by the fact that the share of Smith Corporation's net profits or earnings, after taxes and renegotiation, for the years 1940 through 1944 applicable to Investment Company's holdings of stock amounted to $4,784.35 per share of Investment Company stock of which $4,284.55 remained undistributed at the end of that period or a distribution of approximately 10 per cent *139 of the earnings for the five-year period. During the years 1940 through 1944 in which the average annual portion of Smith Corporation's earnings applicable per share to Investment Company stock amounted to $956.87, after taxes and renegotiation, and the undistributed portion thereof amounted to $856.91, Investment Company's net earnings per share totaled $539.38, or an average annual amount of $107.87 per share, and dividends paid per share totaled $541.12 or an average annual amount of $108.22. Obviously, the net earnings or income of Investment Company, of which practically all was from its holdings of Smith Corporation stock, and the dividends paid by Investment Company under the foregoing circumstances and standing alone afford little indication of the value of Investment Company stock. The portion of the Smith Corporation's earnings applicable to the shares of Investment Company stock affords a more reliable index of the value of Investment Company stock. The petitioners submitted the opinion testimony of three witnesses as to the value of the Investment Company stock on the critical date, all of whom explained the bases upon which they reached the values testified to. One witness *140 who made a valuation of the stock early in 1945 in connection with the administration of the decedent's estate testified to a value of $3500 per share. Another witness who made a valuation of the stock in the late summer or early fall of 1945 about the time of the offering of some of the stock for sale placed a value on it of $3135 per share. The third witness who made a valuation of the stock in the spring of 1947 expressed the opinion that the stock had a value of $3350 per share. From a consideration of all the evidence bearing on the value of the 408 shares of Investment Company stock owned by the decedent, including the asset value per share of the stock, the earnings and dividend records of Investment Company and Smith Corporation, the prospects for the future and the opinion testimony of witnesses as to value, we are of the opinion that the stock had a value of $5700 per share or a total value of $2,325,600 on the critical date and have so found as a fact. The remaining issue is whether in a determination of the net estate the petitioners are entitled to a deduction of $50,000 for additional attorneys' fees and also a deduction of $5,000 for additional administration expenses *141 incurred or to be incurred. No evidence has been submitted with respect to either of these items. Consequently, we hold for the respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. The net income and earnings per share for the years 1925 through 1934 are, after payment of interest, on 6 1/2 per cent bonds issued May 1, 1923 in the original amount of $4,725,000 and retired during the period ended July 31, 1934. The earnings per share are on the basis of 500,000 shares of common stock outstanding during the years 1925 through 1934 and are without reference to dividends on outstanding 7 per cent preferred stock. The year ended July 31, 1942 was the first of the corporation's renegotiable years. ↩
2. After deducting provision for renegotiation (less applicable Federal and State taxes) in the net amount of $4,000,000 and before appropriation to special reserves of $1,000,000 for post-war adjustments and rehabilitation, $500,000 for possible loss as custodian of Government property and $350,000 for possible loss from cancellation of war contracts. ↩
5. After inclusion of estimated post-war refund of excess profits tax of $1,221,332 and before appropriation to special reserves. ↩
3. After deducting $211,692 as reserve for advertising and market development. ↩
6. After deducting reserve for advertising and market development in the net amount of $211,692 and after inclusion of estimated post-war refund of excess profits tax of $1,383,287. ↩
4. After deducting provision for renegotiation (less applicable Federal and State taxes) in the net amount of $2,400,000, after deducting reserve for advertising and market development in the amount of $255,603 and prior to provision to reserve for contingencies in regard to 1945 operations under war contracts, which reserve was subsequently cancelled. ↩
7. After deducting reserve for advertising and development in the amount of $253,603.↩
*. Without regard to Wisconsin dividend privilege taxes. ↩
**. Without taking into account advances to decedent of $46,000 in 1932 and $50,000 in 1933, subsequently determined to be dividends distributed to him.↩
*. On March 25, 1948 Smith Corporation increased its capitalization from 500,000 shares of common stock of a par value of $10 each to 1,000,000 shares with a par value of $10 each. The increase of 500,000 shares was distributed to stockholders on April 12, 1948 as a 100 per cent stock dividend. The cash dividend of $1.50 per share shown above is on the basis of the old capitalization. After the increase in capitalization the stock was placed on a dividend basis of 25 cents quarterly or an annual basis of $2.00 per share for the old capitalization. On December 1, 1948 the dividend rate was increased to 40 cents a share quarterly (new capitalization) payable beginning February 1, 1949. Thereafter, the dividend rate continued at $1.60 per share annually which was equivalent to $3.20 per share on the old capitalization.↩